

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
### FORT WORTH

**NO. 2-09-013-CR**

KATHRYN ANN VANDERBURGH                                    APPELLANT

V.

THE STATE OF TEXAS                                                        STATE

------------

FROM THE 43RD DISTRICT COURT OF PARKER COUNTY

------------

## MEMORANDUM OPINION[1]

------------

### I.  Introduction

In one point, Appellant Kathryn Ann Vanderburgh asserts that the trial court erred by taking into account evidence of a homicide while determining her sentence for a DWI conviction.  We affirm.

------

[1] *See* Tex. R. App. P. 47.4.

## II. Factual and Procedural History

Vanderburgh was indicted for the offense of driving while intoxicated—felony repetition, to which she pleaded guilty without a plea bargain. The trial judge acknowledged having read the presentence investigation report, and Sergeant Chris Reed and Corporal Eric Chambless of the Haltom City Police Department and Vanderburgh testified at the punishment trial.

Sergeant Reed testified that in March 2007, he responded to two 911 calls concerning a reported drunk driver at a local fast-food restaurant. Upon his arrival, Sergeant Reed observed Vanderburgh erratically driving her vehicle around the restaurant and onto the sidewalk, her vehicle straddling the narrow curb that divided the drive-through lane from the adjoining property. Specifically, he testified that she was driving like she was in one of the toy cars at a Six Flags amusement park, "[the one] that you ride but you don't really have to steer because they just bounce along on a track." Sergeant Reed conducted a DWI investigation and described Vanderburgh as barely able to stand and "extremely intoxicated." He testified that it was apparent that she had defecated in her pants.

At one point during the stop, Vanderburgh stated to Sergeant Reed that she needed to go home because she thought her roommate was dead.

2

Sergeant Reed asked her why she thought that, and she replied, "Well, I just think that she is." When Sergeant Reed asked her if someone should be sent to the apartment to assist her roommate, she replied, "No." Sergeant Reed testified that he assumed these statements were just the rambling of a highly intoxicated person. He also noted that Vanderburgh had light burns about her face[2] and did not know how she was able to operate her car without hitting something or someone because of her condition. Instead of taking Vanderburgh into custody, he released her to an ambulance.

The next day, Sergeant Reed was dispatched to assist in a death investigation at Vanderburgh's apartment. He testified that Vanderburgh had asked a neighbor to check on her roommate's condition, and the neighbor discovered that she was dead, with a gunshot wound to the chest; the police were called. Sergeant Reed spoke with Vanderburgh again, who appeared to be in the same intoxicated condition she had been in the night before. He also noticed that Vanderburgh was still wearing the same pants from the night before. On cross-examination, Sergeant Reed testified that Vanderburgh had been "no billed" by a Tarrant County grand jury for any charges resulting from the death of her roommate.

---

[2] Vanderburgh testified that the burns on her face occurred when she lit a cigarette and "it just kind of blew up in [her] face."

3

Corporal Chambless testified that it was apparent that Vanderburgh's roommate died from a single gunshot wound to the chest. He found the body on the floor, next to the bed in the single-bedroom efficiency apartment. He interviewed Vanderburgh at the police department and stated that she told him that after arriving at the hospital the previous evening, she removed her IV, which accounted for some blood on her clothing, left the hospital, took a taxi, and went home.[3] At some point, she went out, bought more wine, and continued drinking. Corporal Chambless testified that he understood that Vanderburgh had gone to a neighbor to find out if her roommate was dead and then the police were called.

Corporal Chambless confirmed that Vanderburgh was "no billed" from any offense surrounding the death of her roommate. On cross-examination, he testified that, in his opinion, the grand jury was incorrect in deciding to "no bill" Vanderburgh for her roommate's homicide, that he did not believe Vanderburgh's version of events surrounding the death of her roommate, and that the case was now closed and no longer under investigation.

Vanderburgh described herself as a fifty-seven year old alcoholic — a binge drinker who had battled alcohol dependency for years. She testified that she

---

[3] Vanderburgh testified that she was drunk during the interview with Corporal Chambless and did not remember the entire interview.

4

binge-drank as a result of pain from a broken shoulder but that she "suppose[d] there's no excuse" to binge drink.[4]  At the time of her arrest, she weighed under 100 pounds and her blood alcohol content ("BAC") was .30; she agreed that at a BAC level of .40, she would have been dead.

Vanderburgh testified that she had five prior DWI convictions, three in Texas and two in California, the first in 1993, and that her numerous attempts at completing alcohol abuse rehabilitation programs in various places over a period of years had not been successful.  She took "Antabuse" to try to prevent her drinking from 1994 to 2002, as a condition set by her then-husband to sustain their marriage.  She spent twenty-eight days at a rehab center in the Hurst-Euless-Bedford area in 1993, participated in the EXCEL alcohol treatment program at Timber Lawn in Dallas for a few months in 1994, went to rehab in Pennsylvania for several weeks in October 2003, and spent sixteen months in New Jersey in rehab.  She had also been sent to a mental hospital in Massachusetts at one point because she had threatened to commit suicide. She received counseling for her alcohol problem while on probation for DWI in 2005 and 2007.

---

[4] She also testified about a number of other physical problems that she had, including osteoporosis, pleurisy, and serious eye problems.

Vanderburgh told the trial judge that she did not see a solution to her alcoholism and admitted that there was no question but that she was guilty as charged in this case. On cross-examination, Vanderburgh also admitted to being on a Tarrant County DWI probation at the time she committed the present DWI offense in Parker County, denied having any memory about how her roommate got shot, confirmed her actions surrounding her roommate's death as related by the State's witnesses, and stated that at the time, she was "so drunk [she] didn't even know [the roommate] was dead."

Vanderburgh asked for a probated sentence with extensive inpatient alcohol treatment. The State asked for a sentence of between eight to ten years. The trial judge stated that based on Vanderburgh's numerous failed attempts to treat her alcohol problem, he had to protect the community by keeping her off the highway. He then sentenced Vanderburgh to eight years' confinement. This appeal followed.

### III. Punishment Evidence

Vanderburgh posits her sole issue as follows: "In this case the Appellant is not objecting to the sentence imposed, which is within the statutory limits for the offense; but rather is objecting to the manner in which it was arrived at," referring to the evidence admitted concerning her roommate's death. The State responds that Vanderburgh failed to preserve her issue for review because

6

she failed to object at trial and that Vanderburgh waived any error because the evidence she complains of now was also admitted in various places without objection.

## A. Standard of Review

While our review of a trial court's admission or exclusion of evidence is under the abuse of discretion standard, including extraneous offense evidence during the punishment phase of a trial, *Mitchell v. State*, 931 S.W.2d 950, 953 (Tex. Crim. App. 1996); *Erdman v. State*, 861 S.W.2d 890, 893 (Tex. Crim. App. 1993), a complaining party must preserve a complaint for our review, that is, they must have presented to the trial court a timely request, objection, or motion that states the specific grounds for the desired ruling if they are not apparent from the context of the request, objection, or motion. Tex. R. App. P. 33.1(a)(1); *Mosley v. State*, 983 S.W.2d 249, 265 (Tex. Crim. App. 1998) (op. on reh'g), *cert. denied,* 526 U.S. 1070 (1999). Further, the trial court must have ruled on the request, objection, or motion, either expressly or implicitly, or the complaining party must have objected to the trial court's refusal to rule. Tex. R. App. P. 33.1(a)(2); *Mendez v. State*, 138 S.W.3d 334, 341 (Tex. Crim. App. 2004).

Additionally, an objection must be made as soon as the basis for the objection becomes apparent. Tex. R. Evid. 103(a)(1); *Lagrone v. State*, 942

7

S.W.2d 602, 618 (Tex. Crim. App.), *cert. denied*, 522 U.S. 917 (1997); *Polk v. State*, 729 S.W.2d 749, 753 (Tex. Crim. App. 1987). And to preserve error, a party must continue to object each time the objectionable evidence is offered. *Fuentes v. State*, 991 S.W.2d 267, 273 (Tex. Crim. App.), *cert. denied,* 528 U.S. 1026 (1999); *Ethington v. State*, 819 S.W.2d 854, 858–59 (Tex. Crim. App. 1991). A trial court's erroneous admission of evidence will not require reversal when other such evidence was received without objection, either before or after the complained-of ruling. *Leday v. State*, 983 S.W.2d 713, 718 (Tex. Crim. App. 1998); *Johnson v. State*, 803 S.W.2d 272, 291 (Tex. Crim. App. 1990), *cert. denied*, 501 U.S. 1259 (1991), *overruled on other grounds by Heitman v. State*, 815 S.W.2d 681 (Tex. Crim. App. 1991). This rule applies whether the other evidence was introduced by the defendant or the State. *Leday*, 983 S.W.2d at 718.

**B. Trial Testimony**

The following evidence was admitted without objection during the punishment phase of Vanderburgh's trial.

Cross Examination (Sergeant Reed)

Q. Officer, is this the same situation on March 3 of 2007, that Ms. Vanderburgh was no billed for a murder charge?

A. Yes, that's correct.

. . . .

Direct Examination (Corporal Chambless)

Q. Okay. Did you respond to the death investigation [Sergeant Reed] was taking about?

A. I did.

Q. All right. And when you got out there, did you meet Ms. Vanderburgh?

A. I did.

Q. And did you get a chance to go through the crime scene?

A. I did.

. . . .

Q. . . . . [W]ho was the deceased person?

. . . .

A. I believe her name was Becky Mooney.

Q. All right. We'll just call her Becky if that's all right. Where was Becky when you found her?

A. On the floor next to the bed.

Q. In the one and only bedroom?

A. Yes.

Q. All right. And did you find that she had been shot?

A. Yes.

9

. . . .

Q. . . . . Where was she shot on her person?

A. Just above her left breast.

Q. Okay. And where — what was the location where she had been shot, if you could tell?

A. On the bed.

Q. All right. Did you have a chance to speak with Ms. Vanderburgh about the death of her roommate?

A. I did.

. . . .

Direct Examination (Corporal Chambless)

Q. Corporal Chambless, just so that the time line's clear for the court, from what you understand, her roommate is shot, however that happens, and then the defendant Ms. Vanderburgh goes out, is arrested for DWI and then sent to the hospital instead of being taken to jail, and then she gets out, comes back home, and the neighbor gets contacted, I guess, by the defendant to find out if her roommate's dead, according to the defendant, and then you all come out there; is that pretty much it?

A. Yes.

Q. Okay. And as counsel asked Sergeant Reed, that case actually was no billed by the Tarrant County grand jury?

A. Yes.

. . . .

Cross Examination (Corporal Chambless)

10

Q. Is there any new evidence that's come to light since March of '07 that could help us determine if she did commit a murder or not?

A. That case has been closed and I'm no longer investigating it.

. . . .

Cross Examination (Vanderburgh)

Q. And whatever happened, at some point you got intoxicated, and at some point you're holding a gun, and somehow it goes off and she gets shot, right?

A. I don't really know what happened. . . . And I don't know what happened. And maybe I—I don't know. But if I'm responsible, by golly, I will—I would do anything. Anything. I take responsibility for what I do. And it's—

Q. Let me ask you this, regardless—regardless of whether you shot her, she shot herself, whatever happened, when you left your apartment there, okay, and you went out, you knew you were drunk, right?

A. Yes.

. . . .

Q. . . . . Wouldn't you agree that [her conduct related to the roommate's death] should have been a wake-up call, something that made you stop drinking, sit up and go, "Oh my God, I've got to stop doing this[?]" . . .

A. I don't know, sir. It was a horrible thing. I've never been around anybody who was dead. And I was so drunk I didn't even know she was dead. And to think that I was in the apartment with someone that was dead is beyond my imagination.

Q. Okay. But you actually left her there, as you thought she was dead, and went out and got a DWI, right?

11

A.  All of that is not clear to me.  I know it was—that was heard today, but it was not clear to me.

Q.  Okay.  Would you disbelieve the officer if he said that he—that you told him that you had a friend that you left home and thought she was dying or you remember dying?

A  I think he said that I thought she was dead.  And I don't know why I would say that.

Q.  But in fact it was true.

A.  Yes, it was true.

         . . . .

Q.  Do you know how long it was after you got back there to the apartment and started drinking again that you finally went up and got your neighbor to find out if Becky had passed away?

A.  Those are not the details.  As soon as I got back, I started drinking again, I believe.  And uh—I don't know exactly what time it was the next afternoon.  And there was a knock on the door. And I asked the woman to check on her.  I didn't go get the neighbor.  I asked her to check on her.  And then I asked her to call the police because I didn't have a telephone.

Q.  So if she didn't come downstairs and knock on your door, there's no telling how long it would have been before you notified somebody that your roommate was laying there in your apartment dead.

A.  That's possible.  I don't know.

## C.  Analysis

It is readily apparent that the record is replete with evidence of

Vanderburgh's roommate's death, its investigation, and her no-bill from the

12

grand jury and that her trial counsel made no objection to any of it.  Therefore, Vanderburgh failed to preserve her issue for review.  We overrule her sole issue.

### IV.  Conclusion

Having overruled her sole issue, we affirm the trial court's judgment.


PER CURIAM

PANEL:  MCCOY, WALKER, and MEIER, JJ.

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED: June 18, 2009